## Revocation of Restaurant License
## of Moeroe Corporation

*Samuel Pepper,* for appellant.

*Kenneth F. Carobus,* Assistant Attorney General, for Commonwealth.

SPORKIN, J., January 16, 1974.—Moeroe Corporation (appellant), a Pennsylvania corporation, is a liquor licensee in Philadelphia, trading as "Talk of the Town." Prior to September 10, 1968, the officers of appellant were listed as Arlene F. Vailbus, president; Rosemary Hacker, secretary-treasurer, director and stockholder; Joseph Litvin, director and Fred Vitello, director. On that date, appellant filed with the Pennsylvania Liquor Control Board (board) a notification of a change in its officers, listing Robert Solack as president and director; Robert Smith as secretary-treasurer, director, manager and stockholder; and Morton Friendly, director.

Thereafter, on October 7, 1968, appellant filed another notice of a change in its officers, listing Lillian J. Smith as president and director, and Robert Smith, secretary-treasurer, director, manager and stockholder. No further change in the corporate officers has been effected since that date, and no transfer of stock has taken place. Lillian J. Smith is the wife of Robert Smith; Robert Smith deserted her, however, in 1969 or 1970.

On July 12, 1971, the board cited appellant for violations of the Liquor Code of April 12, 1951, P. L. 90, 47 PS §1-101, et seq. On August 12, 1971, the board issued an amended citation ordering appellant to show cause why the license and amusement permit of appellant should not be revoked and its bond forfeited. An evidentiary hearing was held and thereafter, on January 17, 1972, the board issued its opinion and order.

In its opinion, the board made the following findings of fact:

"1. The licensee perpetrated a fraud upon the Pennsylvania Liquor Control Board in that the signatures of Robert Smith on the applications for Restaurant Liquor License for the years that expired October 31, 1970, and October 31, 1971 were forged.

"2. The licensee falsified applications for restaurant Liquor License for the years that expired October 31, 1970 and October 31, 1971.

"3. The licensed Corporation was not the only one pecuniarily interested in the licensed business. ·

"4. The licensed establishment operated by the licensee was not a bona fide restaurant in that the food portion of the licensed business was conducted as a concession by other persons.

"5. The licensee appointed a manager, without Board approval."

On the basis of this factual finding, appellant's liquor license was revoked. From this decision of the board, appellant filed the instant appeal pursuant to the Act of April 12, 1951, P. L. 90, art. IV, as amended, 47 PS §4-471.

It is a well-established rule in Pennsylvania that an appeal to this court from a decision of the board gives rise to a de novo hearing at which the board has the duty and the burden to establish any and all violations by a fair preponderance of the evidence; the licensee does not have the burden of disproving the findings of the board: Speranza Liquor License Case, 416 Pa. 348, 206 A. 2d 292 (1965). Unless the court, following an appeal, makes findings of fact on the material issues distinguishable from those found by the board, the penalty imposed by the board (if assessed in its proper discretion) cannot be changed or modified: Carver House, Inc. Liquor License Case, 454 Pa. 38, 41, 310 A. 2d 81 (1973). Our primary inquiry, therefore, must be directed toward determining whether the board's findings in this case were correct.

Upon review of the testimony, of the arguments and of the briefs of counsel, we conclude that the board's findings numbers 2 and 5 must be sustained, finding number 1 modified, and that findings numbers 3 and 4, not having been adequately substantiated by the record, should be reversed. Notwithstanding our altered findings, however, we do not find it appropriate to change the penalty imposed by the board.[1]

## I.

The board's finding number 1, cited previously, concludes that appellant perpetrated a fraud on the board in that the signatures of the applicant, "Robert Smith," on appellant's renewal applications for the years expiring October 31, 1970, and October 31, 1971, were "forged." Our review of the evidence convinces us that the signature of Robert Smith on such applications was written by someone other than Robert Smith, and was, indeed, false, and that such action by the licensee amounted to a fraud against the board, but we have difficulty with the characterization by the board of such action as constituting "forgery."

Judge Griffiths, in the case of Royal Hubley, Inc., Esquire Tavern, Liquor License Case, Court of Quarter Sessions, December term, 1964, no. 1398 (filed March 16, 1966), affirmed per curiam, 209 Pa. Superior Ct. 777, 231 A. 2d 191 (1967), held that where the signature on the application for renewal of a restaurant liquor license was not, in fact, that of the named applicant, such conduct "without more," did not

---

[1] In treating the challenges by appellant to the board's finding of fact, we find it more expedient to organize those findings and to divide our discussion into three separate categories. We shall accordingly treat findings 1 and 2 together in section I of this opinion, findings 3 and 4 together in section II, and finding 5 in section III of this opinion.

constitute forgery either under the Act of June 24, 1939, P. L. 872, sec. 1014, 18 PS §5014, now Act of December 6, 1972, P. L. 1068, 18 PS §4101, et seq., or as set forth in case law. [Citing Shay v. Merchants Banking Trust Co., 335 Pa. 101, 6 A. 2d 536 (1939)]. Judge Griffiths made no further elaboration of the reasons for his conclusion, however, and we do not believe that we are bound in the present case by the bald holding of the Royal Hubley court. Our reading of section 5014 impels us to conclude that the falsification of the applicant's signature here *is*, in fact, squarely within the definition of forgery.[2]

At the hearing before this court, the board introduced a signature card containing the fingerprints of Robert Smith together with his signature. We accepted such exhibit as the actual signature of Robert Smith. The board also introduced documents previously filed by appellant, notifying the board in two instances of changes in the organizational structure of appellant, and the board further introduced renewal applications of appellant for the years ending October 31, 1970, and October 31, 1971. Each of these documents purported to contain the signature of Robert Smith as the filing party. Lieutenant John R. Smith, of the Philadelphia Police Department, whose title is

---

[2] The relevant statutory provision reads as follows:

"Section 5014. Forgery and uttering forged instruments

"Whoever *fraudulently* makes, signs, alters, utters or publishes, or is concerned in the fraudulently making, signing, altering, uttering or publishing any written instrument, *to the prejudice of another's right,* with intent to defraud any person or body corporate, or fraudulently causes or procures the same to be done, is guilty of a felony, and upon conviction thereof, shall be sentenced to pay a fine not exceeding five thousand dollars ($5,000), or to undergo an imprisonment, by separate or solitary confinement at labor, not exceeding ten (10) years, or both. 1939, June 24, P. L. 872, §1014." (Italics supplied.)

that of "Document Examiner," was called by the board as a witness;[3] Lieutenant Smith compared the signatures on each of the four documents presented by the board with the signature of Robert Smith on the fingerprint card referred to previously. Lt. Smith testified that the signature on appellant's notice of change in its organization, dated October 7, 1968, purporting to be that of Robert Smith was *not* Smith's signature, but instead was a "copy" of the same. Lieutenant Smith further testified that the signatures on the renewal applications submitted by appellant to the board, again purporting to be those of Robert Smith, were also falsified and were affixed to the applications by some party other than Robert Smith.

Appellant objected to the competency of Lieutenant Smith's testimony, asserting that Lieutenant Smith was not an "expert" qualified to determine the authenticity of the signatures in question. We overruled this objection. As clearly stated in the Act of May 15, 1895, P. L. 69, sec. 1; 1913, June 6, P. L. 451, sec. 1, entitled "Opinion evidence as to handwriting":

"Where there is a question as to any writing, the opinions of the following persons shall be deemed to be relevant:

"(b) the opinion of those who have had special experience with, or who have pursued special studies relating to, documents, handwriting, and alterations thereof, who are herein called experts": 28 PS §161.

Lieutenant Smith, who had undergone a three-week course in document examination, who has had vast experience in examining documents, and who has testified in our courts as well as in other jurisdictions as to the authenticity of documents did, we hold, have the "special experience" and had pursued the "special

---

[3] It is relevant to note that Lieutenant Smith is not related to either Robert Smith or Lillian Smith, the officers of appellant.

studies" necessary to qualify him under 28 PS §161 to render opinion evidence as to the authenticity of the signatures of Robert Smith on the documents in question. The *weight* to be given such testimony was, of course, for the court: 28 PS §162.

Furthermore, it is obvious upon a mere cursory examination of the documents introduced by the board that the signatures on the renewal applications filed by appellant were not those of Robert Smith, and it is apparent that the signature on the notice of organizational change filed by appellant on October 7, 1968, was not written by Robert Smith's hand. Thus, even if Lieutenant Smith does not qualify as an expert, our own comparisons of the questioned documents with the genuine signature on the fingerprint card convince us that the signatures on the questioned documents were falsified, and handwriting comparison is always within the province of the fact finder: Commonwealth v. Gipe, 169 Pa. Superior Ct. 623, 84 A. 2d 366 (1951). It is to be noted additionally that Lillian Smith confirmed the conclusions reached by Lieutenant Smith, stating that the questioned signatures were not genuine.

It is clear to us that the falsification of a signature on a document filed with the board is tantamount to perpetration of a *fraud* against the board: Royal Hubley, supra. We further hold that such false and fraudulent signing of these written instruments *prejudiced the right of another*, namely the right of the board to know with whom it is dealing, to know who is in charge of the licensed premises, and to know who the corporate officers are so that, in the interests of public health, safety and welfare, the board may ascertain whether the premises are being operated by and are under the control of reputable parties. These rights are given to the board by law: Act of April 21, 1951,

P. L. 90, 47 PS §4-403(d), (e), §5-517, and Regulations, sec. 109.09, sec. 114.01. Thus, as heretofore discussed, we *are* convinced that such falsification of the applicant's signatures on the documents in *this* case *was* forgery.

Moreover, even if the falsification of the applicant's signatures on the applications submitted by appellant were held not to constitute *forgery*, as pronounced in Royal Hubley, supra, such action is still a violation of The Penal Code of June 24, 1939, P. L. 872, sec. 328, added September 26, 1951, P. L. 1535, sec. 1, 18 PS §4328.[4] It is obvious to us that the falsification of the applicant's signature on these three documents, the filing of which was required by the board, was a "falsification" in a "matter within the jurisdiction of a board of the Commonwealth of Pennsylvania," and, therefore, violated the quoted statutory provision. In light of the foregoing discussion, we have modified the board's finding number 1 to state that:

1. The licensee perpetrated a fraud upon the Pennsylvania Liquor Control Board in that the signatures of Robert Smith on the notification of change in officers, dated October 7, 1968, and on the applications for renewal of the restaurant liquor license of Moeroe Corporation for the years that expired October 31,

---

[4] Section 4328 provides that:

"Whoever, in any *matter within the jurisdiction of any department, board, commission or agency of the Commonwealth of Pennsylvania,* knowingly and willfully falsifies, conceals or covers up, by any trick, scheme or device, a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document, knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced to pay a fine not exceeding three hundred dollars ($300) or undergo imprisonment not exceeding one (1) year, or both." (Italics supplied.)

1970, and October 31, 1971, were falsified, in violation of The Pennsylvania Penal Code of June 24, 1939, P. L. 872, added September 26, 1951, P. L. 1535, sec. 1, 18 PS §4328.

## II.

In its findings of fact numbers 3 and 4, as heretofore indicated, the board concluded that appellant was not the only one "pecuniarily interested" in the licensed business, and that the establishment as operated by appellant was not a "restaurant" within the meaning of that term in the Liquor Code and the board regulations, because the food service of the establishment was conducted as a "concession" by persons other than appellant. The latter finding (number 4) was based on the fact that the manager of the food service was paid on a percentage basis. (Mr. and Mrs. Joe Lowe, who operated the food service, received a salary from appellant of $150 per week, plus 10 percent of the weekly food receipts in excess of $1,000.[5] The board

---

[5] As stated to the parties at the hearing on this appeal, we allowed a wide scope of testimony, with the caveat that such testimony as was later found to be irrelevant, incompetent or immaterial would not be considered in our final adjudication. (N.T. 165). Although we allowed the board to introduce testimony through its enforcement officer, Oscar Laison (Laison), that Mr. Lowe told Laison that he, Lowe, had operated the food portion of the establishment in return for reimbursement of costs plus 50 percent of the profits, we have on reconsideration decided to strike such testimony as inadmissible hearsay. The board asserts that such testimony is admissible under the exception to the hearsay rule covering declarations against pecuniary interest, but we are unable to accept such argument, since Mr. Lowe had terminated his duties at the premises five months prior to his statement to Laison and was owed no money by appellant at the time of his statement. As noted by Wigmore, to satisfy this exception to the hearsay rule, the declaration must endanger the pocketbook of the declarent: 2 Wigmore (3rd ed.) §253. It is plain to us that, since Lowe was no longer under contract with appellant, was no longer

further held that one who receives a percentage of the profits of a business is by definition "pecuniarily interested" in that business. With these conclusions, we cannot agree.

The board's conclusion that the food service of the establishment was conducted as a concession, predicated as it was on the mere fact that Mr. and Mrs. Joe Lowe, who operated the service, were paid a percentage of the profits, gives far too broad a reading to the term "concessionaire." A concessionaire has been defined in Pennsylvania as an independent entrepreneur, who is neither agent nor employe of the grantor of the concession: Jacobson v. Belplaza Corp., 80 F. Supp. 917 (1948), affirmed sub nom., Jacobson v. Richards & Hassen Enterprises, 172 F. 2d 464 (1949). This distinction obviously turns on the independence of the concessionaire from control by the owner of the establishment and, therefore, on the "proprietary" duties and responsibilities of the concessionaire. Thus, the fact that the operator of a portion of a business is paid from a percentage of the business profits is merely one element in, but is by no means the sole test for deciding whether such operator is an employe of the owner or is interested as a "concessionaire."

As it relates to the conduct of the food service by Mr. and Mrs. Lowe, the only competent testimony before this court demonstrated that the Lowes operated the kitchen and determined what the menu would be; in so doing, they used some of their own equipment but the heavy equipment was furnished by appellant as a permanent fixture in the establish-

operating any portion of the establishment, and was owed no money by appellant, the statement made by him to Laison did not in any way endanger his pocketbook and was, therefore, not against his pecuniary interest; the utterance was thus not admissible as an exception to the hearsay rule.

ment. There was no showing that the Lowes hired or fired employes working under them, or in fact that any other employes operated the food service of the establishment. These facts, we find, do not meet the burden which the board must carry to show that the Lowes operated the food portion of the premises free from control by the owner of the establishment (appellant).

Nor do we find logic in the reasoning of the board that because Mr. and Mrs. Lowe received a percentage of the profits of the establishment they were "concessionaires," and had a "pecuniary interest" in the establishment. This problem was resolved rather convincingly in the case of De Michelis License, 65 D. & C. 92 (1948). In that case the court reasoned as follows:

"The Beverage License Act does not define pecuniary interest. In an appeal of Employees Home Association of Harrisburg, 50 Dauph. 108, 111, Judge Wickersham refers to offending interest as a 'proprietary interest.' We believe this reference throws some light on the proper interpretation of the term and conclude that the interest to offend the statute must at least sound in the attributes of *proprietorship*.

". . .

"The only possible evidence to prove a pecuniary interest in the business on the part of Izzo is the sharing in the net profits. However, in this case there was no *domination or control* of the business by Izzo and we fail to see how we could reasonably hold that Izzo had a pecuniary interest in the operation of the business without doing violence to the proper interpretation of the statute." (Italics supplied.)

We have found, as discussed earlier, that Mr. and Mrs. Lowe did not have such independence as to amount to "domination or control" by them of the food service at the premises. Further, they were at all times

subject to being fired by appellant's manager. We cannot see how the sole fact that they received a percentage of the profits in excess of $1,000 per week amounted to the "domination or control" or "proprietorship" held by our courts to be a landmark of "pecuniary interest." In light of this discussion, then, we have reversed the board's findings of fact 3 and 4.

## III.

Finally, we come to the board's finding that appellant appointed a manager without board approval (finding of fact number 5). We believe that this finding was supported by a preponderance of the evidence produced at the hearing on appeal, and we, therefore, have sustained this finding.

The board's regulations, 40 Pa. Code §5.23 provide, in pertinent part, that:

"(a) Any corporation holding one or more licenses must appoint an individual as manager for each licensed establishment . . .

"(b) No individual may act in the capacity of manager in a licensed establishment until the licensee has received approval from the Board. The following rules shall apply:

". . .

"(2) If there is any change of manager, the licensee shall immediately give to the Board written notice of such change, together with full information for the new individual desired to be appointed."

Our courts have defined the term "manager" as a person chosen or appointed to direct, control, govern, administer or oversee operations in the establishment: Commonwealth v. Johnson, 144 Pa. 377, 381, 22 Atl. 703 (1891).

The transcript discloses that Lillian Smith retained

the services of a series of "friends" to oversee the establishment following her husband's desertion in 1969 or 1970 and the concurrent onset of an illness which rendered her physically unable to run the business herself.[6] These "friends" opened and operated checking accounts in behalf of appellant, in some cases listing themselves as manager or as an officer of appellant; they had authority to and did purchase liquor; they hired and fired personnel.

These men were given the authority and the responsibility to oversee and direct operations at the licensed premises; Mrs. Smith took no active role in the conduct of appellant's business during that period. It is, therefore, clear to us that these "friends" were, in reality, managers within the meaning of that term.

The board has the duty, in the interests of the health, safety and welfare of Pennsylvania citizens, to insure that licensed establishments are run only by reputable parties. When a licensee withholds information pertaining to a change in its managers, as appellant has done here, the board is unlawfully prevented from carrying out its function.[7] Since

---

[6] Unfortunately, full financial records were not available to indicate the total panoply of employes who worked at the establishment, or to possibly reveal the complete list of "friends" who directed operations during Lillian Smith's illness. Some records were available because the board's enforcement officer, Laison, was permitted to take them for photocopying when he examined appellant's files on a visit to the establishment in January, 1971. The balance of appellant's records, however, have disappeared. Appellant contends that Robert Smith evidently perceived some untold use for the files and took them when he absconded, and that the remainder of the records, save those taken by Laison for copying, were destroyed in a fire alleged by appellant to have erupted among the files in February of 1971, which did no damage except to the files and to the floor area on which they were kept.

[7] The untoward effects of withholding information as to a change in the managers of a licensed establishment are aptly

appellant changed managers without apprising the board, depriving the board of an opportunity to investigate the character of the men who managed a facility within the board's jurisdiction, we must conclude that appellant violated 40 Pa. Code §5.23, supra.

In light of the foregoing discussion, we have, as explained previously, modified the board's finding of fact number 1, sustained the board's findings numbers 2 and 5 and reversed the board's findings numbers 3 and 4. We are left, however, with the conclusion, supported by a preponderance of the evidence adduced on this appeal, that appellant has falsified the applicant's signature on documents filed pursuant to board regulations, which conduct is a violation of The Penal Code, that in falsifying these signatures appellant perpetrated a fraud upon the board, and that appellant failed to notify or to gain approval by the board of its several changes in managers of the establishment, which conduct was a violation of the Liquor Code regulations: 40 Pa. Code §5.23. Taken together, these violations are, we hold, of such magnitude as to compel us to affirm the penalty imposed by the board, and the revocation of appellant's license by the board accordingly must be affirmed.

## ORDER

And now, to wit, January 16, 1974, the appeal of Moeroe Corporation is dismissed, and the order of the Pennsylvania Liquor Control Board is affirmed.

---

illustrated by Mrs. Smith's own testimony that she had submitted an application to the board for approval of one of the managers retained by her, one Anthony DiBona, but had subsequently learned that DiBona had a criminal record; Mrs. Smith testified that when she became aware of this information she "forgot about that [the application for board approval of DiBona] completely."